WASTE INDUSTRIES USA, INC. AND BLACK BEAR DISPOSAL, LLC, PLAINTIFFS V.
STATE OF NORTH CAROLINA AND NORTH CAROLINA DEPARTMENT OF ENVI-
RONMENTAL AND NATURAL RESOURCES, DEFENDANTS AND NORTH CAROLINA
STATE CONFERENCE OF BRANCHES OF THE NAACP, AND ROGERS-EUBANKS
NEIGHBORHOOD ASSOCIATION, DEFENDANT-INTERVENORS AND NORTH CAR-
OLINA COASTAL FEDERATION AND THE NORTH CAROLINA CHAPTER OF
SIERRA CLUB, DEFENDANT-INTERVENORS

No. COA11-246

(Filed 1 May 2012)

**1. Constitutional Law—Commerce Clause—insufficient evidence
of discrimination—insufficient evidence that burden
clearly outweighed purpose**

The trial court did not err by concluding that N.C.G.S.
§ 130A-295.6, which places limitations on the size and location of
solid waste landfills, did not violate the Commerce Clause by dis-
criminating against out-of-state waste and granting summary
judgment in favor of defendants. Plaintiffs failed to demonstrate
that the legislation was discriminatory facially, in purpose, or in
effect. Furthermore, plaintiffs failed to forecast evidence that the
burden on interstate commerce clearly outweighed the State's
legitimate purposes.

**2. Constitutional Law—Contract Clause—insufficient evidence
of unconstitutional impairment**

The trial court did not err by concluding that N.C.G.S.
§ 130A-295.6, which places limitations on the size and location of
solid waste landfills, did not violate the Contract Clause and
granting summary judgment in favor of defendants. Plaintiffs
failed to forecast any evidence that their contract with Camden
County was unconstitutionally impaired.

**3. Common Law—vested rights doctrine—landfill project—no
permit issues—no vested right—no misuse of political
process**

The trial court did not err in granting defendants' motion for
summary judgment in a case concerning a franchise agreement
for a solid waste landfill. Plaintiffs did not have a common law
vested right in the proposed landfill as no permit had been issued
before the challenged legislation became applicable. Furthermore,
there was no evidence that the legislature misused the political
process in order to dictate the outcome of plaintiff's application
for the proposed landfill.

Appeal by plaintiffs from order entered 13 September 2010 by Judge Henry W. Hight, Jr. in Wake County Superior Court. Heard in the Court of Appeals 29 September 2011.

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene, Lee M. Whitman, Tobias S. Hampson, and Sarah M. Johnson, for plaintiffs-appellants.*

*Attorney General Roy Cooper, by Assistant Solicitor General John F. Maddrey, and Senior Deputy Attorney General James C. Gulick, for defendants-appellees.*

*Southern Coalition for Social Justice, by Allison J. Riggs and Anita S. Earls, for North Carolina State Conference of Branches of the NAACP and Rogers-Eubanks Neighborhood Association, defendant-intervenors-appellees.*

*Southern Environmental Law Center, by Chandra T. Taylor and Susannah Knox, for North Carolina Coastal Federation and The North Carolina Chapter of Sierra Club, defendant-intervenors-appellees.*

GEER, Judge.

Plaintiffs Waste Industries USA, Inc. and Black Bear Disposal, LLC appeal the trial court's grant of summary judgment in favor of defendants and defendant-intervenors. Plaintiffs primarily argue that N.C. Gen. Stat. § 130A-295.6 (2011), which placed limitations on the size and location of solid waste landfills, violates the Commerce Clause by discriminating against out-of-state waste.

It is undisputed that the legislation does not facially discriminate. In addition, the General Assembly, in the session law, set out in detail the purposes of the legislation, none of which in any way suggest an intent to discriminate against out-of-state waste. In the face of (1) these articulated objectives, (2) the State's long-time policy against expansion of landfills, (3) the State's failure, a year prior to enactment of the challenged legislation, to meet the State's statutorily-mandated goal for reduction of landfill use, and (4) the General Assembly's receipt, after that failure, of extensive information regarding the importance of size and location restrictions on landfills to public health, the environment, environmental justice, and financial security, plaintiffs presented only sparse evidence that the General Assembly actually had a hidden purpose of blocking out-of-state waste. Plaintiffs point to a single remark by one legislator, the presence of senators at a meeting where out-of-state waste was men-

tioned, and few comments by unnamed legislators in unknown contexts and by mid-level State employees, most of which comments did not specifically relate to the challenged restrictions.

We hold that plaintiffs have failed to forecast sufficient evidence to override the General Assembly's articulated objectives and that plaintiffs' evidence of discriminatory effect shows effects on solid waste generally and not out-of-state waste in particular. Because plaintiffs have also failed to show that any incidental effects on out-of-state waste outweigh the benefits to the State, the trial court properly granted summary judgment to defendants and defendant-intervenors on the Commerce Clause claim. Since we find plaintiffs' arguments as to the other claims also unpersuasive, we affirm.

Facts

In 2002, Waste Industries was approached by developers from Virginia who owned land in Camden County, North Carolina. The developers were interested in locating a municipal solid waste landfill on their property. In September 2002, Waste Industries and Camden County entered into negotiations over a franchise agreement for a solid waste landfill. In October 2002, Waste Industries formed Black Bear Disposal, LLC ("Black Bear"), a wholly-owned subsidiary of Waste Industries, to build and operate the landfill.

N.C. Gen. Stat. § 130A-294(b) (2001) required plaintiffs to obtain a franchise agreement from the County prior to applying for a permit to operate a solid waste facility in North Carolina. On 21 October 2002, the Camden County Commissioners passed an ordinance awarding a franchise to Black Bear. The franchise agreement (1) required Black Bear to accept only waste as "allowed by the permit issued" by the State, (2) incorporated by reference the State's solid waste management regulations, and (3) expressly allowed termination of the agreement upon failure of the State to issue a permit or upon changes in the statutes or regulations.

N.C. Gen. Stat. § 130A-294(a)(4)(a) required the North Carolina Department of Environmental and Natural Resources ("DENR") to "[d]evelop a permit system governing the establishment and operation of solid waste management facilities." A solid waste management facility permit has two parts: (1) a permit to construct the facility issued after "site and construction plans have been approved and it has been determined that the facility can be operated in accordance with the applicable rules set forth in this Subchapter"; and (2) a permit to operate the facility issued after demonstrated compliance with

the construction permit. N.C. Admin. Code tit. 15A, r. 13B.0201(b)(1), (2) (Sept. 2001).

In August 2004, Black Bear submitted a site study to DENR as required by N.C. Admin. Code tit. 15A, r. 13B.1618 (Sept. 2001), in order to obtain the necessary permit. Between August 2004 and April 2005, Black Bear made repeated additional submissions regarding the site study. DENR responded to the submissions by pointing out continued inadequacies and inconsistencies in the documentation of existing topography, surface water drainage patterns, high water table values, groundwater flow, drinking water wells, porosity values, facility acreage, landfill acreage, landfill height, and floodplain existence. According to DENR, issues still remained with the site study as of May 2005.

In addition, on 5 April 2005, DENR notified Waste Industries that Black Bear did not meet the financial assurance and responsibility requirements of N.C. Gen. Stat. § 130A-294(b2) (2005). On 3 February 2006, Waste Industries asked to be added as a co-applicant with Black Bear. DENR then requested additional information from Waste Industries and Black Bear on 16 March 2006 and on 25 May 2006.

On 27 July 2006, the General Assembly passed a one-year moratorium on new landfills:

> There is hereby established a moratorium on consideration of applications for a permit and on the issuance of permits for new landfills in the State. The purposes of this moratorium are to allow the State to study solid waste disposal issues in order to protect public health and the environment. The Department of Environment and Natural Resources shall not consider a permit application nor issue a permit for a new landfill for the disposal of construction or demolition waste, municipal solid waste, or industrial solid waste for a period beginning on 1 August 2006 and ending on 1 August 2007.

2006 N.C. Sess. Laws ch. 244, § 2 ("the Moratorium"). The Moratorium did not affect landfills that had permits issued prior to 1 August 2006. *Id.* In the Moratorium legislation, the General Assembly noted eight areas requiring more study in order to update North Carolina's solid waste laws. *Id.* at § 4(a).

On 16 April 2007, the Camden County Commissioners passed an ordinance that extended the required commencement date of landfill operation under plaintiffs' franchise agreement from 4 November

2007 to 4 November 2012. The record does not indicate that any activity took place on plaintiffs' application for a permit during the Moratorium.

At the end of the Moratorium, the General Assembly enacted legislation governing approval of solid-waste landfills, which included additional restrictions for landfills relating to buffers, height, capacity, and size. 2007 N.C. Sess. Laws ch. 550, § 9(a), as amended by 2007 N.C. Sess. Laws ch. 543, § 1(a). This legislation, codified in N.C. Gen. Stat. § 130A-295.6, provided in pertinent part:

> (d)  The Department shall not issue a permit to construct any disposal unit of a sanitary landfill if, at the earlier of (i) the acquisition by the applicant or permit holder of the land or of an option to purchase the land on which the waste disposal unit will be located, (ii) the application by the applicant or permit holder for a franchise agreement, or (iii) at the time of the application for a permit, any portion of the proposed waste disposal unit would be located within:

>> (1)  Five miles of the outermost boundary of a National Wildlife Refuge.

>> (2)  One mile of the outermost boundary of a State gameland owned, leased, or managed by the Wildlife Resources Commission pursuant to G.S. 113-306.

>> (3)  Two miles of the outermost boundary of a component of the State Parks System.

> . . . .

> (i)  The Department shall not issue a permit for a sanitary landfill that authorizes:

>> (1)  A capacity of more than 55 million cubic yards of waste.

>> (2)  A disposal area of more than 350 acres.

>> (3)  A maximum height, including the cap and cover vegetation, of more than 250 feet above the mean natural elevation of the disposal area.

These restrictions ("the challenged restrictions") applied to plaintiffs' pending permit application. See 2007 N.C. Sess. Laws ch. 550, § 9(b), as amended by 2007 N.C. Sess. Laws ch. 543, § 1(b).

On 11 September 2007, DENR informed plaintiffs that their application was still incomplete and that the changes in state law might have rendered the facility unsuitable. On 15 January 2008, plaintiffs nonetheless elected to pay the $50,000.00 permit fee and proceed with their application. DENR denied plaintiffs' application for a permit on 8 May 2008 because (1) plaintiffs had continued to fail to complete the site suitability application, and (2) the site did not comply with the requirements of N.C. Gen. Stat. § 130A-295.6(d) due to its proximity to a national wildlife refuge and a state park.

On 3 December 2007, plaintiffs brought suit against the State of North Carolina and DENR, alleging that 2007 N.C. Sess. Laws ch. 543 and ch. 550 violated the United States Constitution and the State Constitution on various grounds and deprived plaintiffs of their common law vested rights. Plaintiffs sought declaratory relief and a writ of mandamus.

On 31 December 2009, the North Carolina State Conference of Branches of the NAACP and the Rogers-Eubanks Neighborhood Association were allowed to intervene. The trial court also granted the motion to intervene of the North Carolina Coastal Federation and the North Carolina Chapter of the Sierra Club on 2 March 2010.

All parties moved for summary judgment. At the hearing on the motions on 24 August 2010, all parties agreed that there were no issues of material fact and that summary judgment was appropriate for the disposition of the case. On 13 September 2010, the trial court entered an order denying plaintiffs' motion for summary judgment and granting defendants and defendant-intervenors' motions for summary judgment. Plaintiffs timely appealed to this Court.

## Discussion

Plaintiffs contend on appeal that the challenged restrictions violate the Commerce Clause and the Contract Clause of the United States Constitution, as well as their common law vested rights, and that the trial court, therefore, should have granted plaintiffs' motion for summary judgment. Alternatively, plaintiffs contend that genuine issues of material fact exist, and this case should be remanded for trial.

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c). The party moving for summary

judgment has the burden of establishing the lack of any triable issue. *Collingwood v. Gen. Electric Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Once the moving party meets its burden, then the non-moving party must "produce a forecast of evidence demonstrating that the plaintiff will be able to make out at least a prima facie case at trial." *Id.* This Court reviews the trial court's grant of summary judgment de novo. *Nationwide Mut. Fire Ins. Co. v. Mnatsakanov*, 191 N.C. App. 802, 805, 664 S.E.2d 13, 15 (2008).

I

**[1]** Plaintiffs first contend that the enacted legislation violates the federal Commerce Clause. Commerce Clause claims are subject to a two-tiered analysis. *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996). "The first tier, a virtually *per se* rule of invalidity, applies where a state law discriminates facially, in its practical effect, or in its purpose." *Id.* (internal quotation marks omitted). "The second tier applies if a statute regulates evenhandedly and only indirectly affects interstate commerce. In that case, the law is valid unless the burdens on commerce are clearly excessive in relation to the putative local benefits." *Id.* (internal quotation marks omitted). Plaintiffs essentially concede that the challenged legislation is not facially discriminatory, but argue that it discriminates against interstate commerce in purpose and in effect and that it, in any event, excessively burdens interstate commerce.

A. Discriminatory Purpose

Plaintiffs first argue that the purpose of the legislation was to block out-of-state waste from entering the State and, therefore, was to discriminate against interstate commerce. The United States Supreme Court, in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7, 66 L. Ed. 2d 659, 668 n.7, 101 S. Ct. 715, 723 n.7 (1981) (internal quotation marks omitted), held that in considering claims that a state statute is unconstitutional, we must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation."

Applying this standard to plaintiffs' Commerce Clause claim, we begin with a review of the General Assembly's articulated objectives. The legislature included in 2007 N.C. Sess. Laws ch. 550 a series of "Whereas" clauses setting out the objectives of the legislation. Those clauses start by discussing the public policy of the State of protecting the State's water quality, including protecting groundwater from contamination and protecting the water quality of rivers and coastal estu-

aries. 2007 N.C. Sess. Laws ch. 550. The clauses point to increased concerns over water quality resulting from recent flooding and drought, the reliance of half the population on groundwater for drinking water, increasing groundwater pollution, and recent documented depletion of large groundwater aquifers. *Id.* Next, the clauses note that the State has rare and endangered plants and animals and that the State's parks, natural areas, and wildlife refuges serve these plants and animals, as well as migrating birds. *Id.* The clauses then recognize that more study is needed on fragile ecosystems; that these ecosystems, along with changes in air and water quality, have impacts outside the state; and that the public should be able to continue to enjoy the natural attractions of the State. *Id.*

The General Assembly continued with the following "Whereas" clauses:

> Whereas, improperly sited, designed, or operated landfills have the potential to cause serious environmental damage, including groundwater contamination; and

> Whereas, it is essential that the State study the siting, design, and operational requirements for landfills for the disposal of solid waste in areas susceptible to flooding from natural disasters, areas with high water tables, and other environmentally sensitive areas in order to protect public health and the environment; and

> . . . .

> Whereas, it is the policy of the State to promote methods of solid waste management that are alternatives to disposal in landfills; . . . .

*Id.*

None of the purposes articulated by the General Assembly in the legislation suggest a purpose of discriminating against out-of-state waste entering the State. Under *Clover Leaf Creamery*, we must, therefore, determine whether the circumstances surrounding the legislation force us to conclude that those purposes were not the real objectives and that one of the real purposes was to discriminate against out-of-state waste. As the Fourth Circuit has observed, the " 'historical background of the decision' " is " 'probative of whether a decisionmaking body was motivated by a discriminatory intent.' " *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 336 (4th Cir.

2001) (quoting *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995)).

In North Carolina, the use of landfills has been the least-preferred option for managing solid waste since the Solid Waste Management Act was enacted in 1989. N.C. Gen. Stat. § 130A-309.04 (1989). At that time, the legislature declared that it "is the policy of the State to promote methods of solid waste management that are alternatives to disposal in landfills . . . ." *Id.* The legislature stated that it "is the goal of this State to reduce the municipal solid waste stream, primarily through source reduction, reuse, recycling, and composting, on a per capita basis, on the following schedule: . . . [f]orty percent (40%) by 30 June 2001." N.C. Gen. Stat. § 130A-309.04(c) (1992).

Governor James Martin issued Executive Order 86 on 1 March 1989 extending the State's 40% deadline until 2006, explaining that "as the most desirable waste management strategy to be undertaken, North Carolina has stated its commitment to prevention, minimization, and recycling of wastes before they impact the State's environment and is committed to reduce its dependence on landfills as a means of solid waste disposal . . . ." N.C. Admin. Code tit. 9, r. 2B.0000 (Mar. 1989).

By 2006, however, North Carolina had not met the goal of a 40% per capita reduction in solid waste. In July of that year, the General Assembly passed the one-year Moratorium on new landfills to allow time for study. In the preamble to the Moratorium legislation, the General Assembly listed various concerns relating to water quality, environmentally sensitive areas, and public health. The eight areas identified as requiring more study in order to update the State's solid waste laws included financial responsibility requirements; siting, design, and operational requirements in areas susceptible to flooding from natural disasters, areas with high water tables, and other environmentally sensitive areas; and "[w]ays to reduce the amount of solid waste disposed of within North Carolina landfills, including statewide tipping fees, bans on the disposal of certain types of waste in landfills, more aggressive recycling requirements, and enhanced regulatory requirements for landfills and other solid waste management facilities." 2006 N.C. Sess. Laws ch. 244, § 4(a)(8). The General Assembly also established a Joint Select Committee on Environmental Justice to study environmental justice issues including "[t]he impacts that landfills located in proximity to minority and low-income communities have on these communities with regard to human health, the environment, and economic development." *Id.* at § 5(f)(2).

Plaintiffs argue, however, that comments made by legislators in the spring or early summer of 2006, prior to the passage of the Moratorium, suggest that the General Assembly's purpose in adopting the Moratorium was to prevent the importing of out-of-state waste. As support for this claim, plaintiffs cite the affidavit of Lonnie Craven Poole, III, CEO of Waste Industries. Mr. Poole's affidavit stated that certain legislators had reported to him that other unidentified legislators wanted to block the importing of out-of-state waste.

Defendants and defendant-intervenors moved in the trial court to strike these portions of Mr. Poole's affidavit as hearsay, but the record contains no ruling on the motion to strike. On appeal, plaintiffs argue that the statements in Mr. Poole's affidavit were in fact considered by the trial court and properly so. Defendants and defendant-intervenors, however, contend that because the statements were inadmissible, the trial court must not have considered them and urges this Court to disregard them as well.

Even assuming, without deciding, that the anonymous statements reported in Mr. Poole's affidavit are admissible and that the trial court considered them, the primary authority upon which plaintiffs rely for their admissibility demonstrates the statements' lack of relevance in discerning the purpose of the challenged legislation. In *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, 50 L. Ed. 2d 450, 466, 97 S. Ct. 555, 565 (1977) (emphasis added), the authority cited by plaintiffs as supporting admission of these statements, the United States Supreme Court held: "The *legislative or administrative history* may be highly relevant, especially where there are *contemporary statements* by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege."

The Poole affidavit statements were made in wholly unknown contexts by unknown speakers more than a year before the challenged restrictions were passed. Those secondhand statements are not part of any legislative history or any other official reporting of legislators' positions and views. Moreover, they are not contemporary to the legislation challenged on appeal. The statements considered by the Supreme Court in *Village of Arlington Heights* were, in contrast, contained "in the official minutes" and were directly related to the challenged action. *Id.* at 270, 50 L. Ed. 2d at 467, 97 S. Ct. at 566. Plaintiffs cite no authority—and we know of none—suggesting that

WASTE INDUS. USA, INC. v. STATE OF N.C.

[220 N.C. App. 163 (2012)]

the *Clover Leaf Creamery* circumstances warranting a court's overriding express statements of legislative purpose may include anonymous, secondhand statements made in unknown contexts and not contemporaneously with the challenged legislation.

Plaintiffs, however, also argue that the Moratorium itself is evidence that the legislation at issue in this case had the purpose of blocking out-of-state waste. In doing so, they rely on comments made by non-legislators, primarily mid-level employees in the Executive Branch. Plaintiffs point to (1) an inquiry in 2005—two years before the legislation at issue—from an aide to Senator Basnight to the head of the Division of Waste Management with unidentified "questions concerning out of state waste disposal"; (2) a 2005 telephone call from a policy advisor in the Governor's office to a member of DENR saying that she was interested in what could be done regarding the importing of waste; (3) the 2005 annual meeting of the ERC, an Executive Branch commission, at which one of the topics was the increasing volume of both in-state and out-of-state waste in landfills; (4) a photograph presented at the 2006 annual meeting of the ERC, among other materials, showing New York waste; (5) a draft of a never-given speech prepared for the Governor in connection with the signing of the Moratorium mentioning out-of-state waste, but with no evidence of the identity of the author, whether the Governor participated in the preparation of the draft, or even whether the Governor ever saw the draft; (6) portions of Executive Branch employees' depositions indicating their awareness that four proposed landfill projects that were pending at the time of the Moratorium intended to accept out-of-state waste; and (7) a 2007 email from the Section Chief of the Division of Waste Management to a professor at UNC School of Law in which he expressed his "opinion" that "the driving factor in the moratorium was the out-of-state waste issue."

Plaintiffs have cited no authority that remarks by such mid-level State employees—and not legislators who enacted the Moratorium or the Governor who signed it into law—are relevant to prove that the expressed purposes of the Moratorium were not the true purposes. Nor have plaintiffs cited any authority that such comments relating to prior legislation are sufficient to override the articulated objectives in the legislation challenged as unconstitutional.

As for evidence regarding the challenged legislation, plaintiffs point to a single statement from a legislator: a remark made by Senator Ellie Kinnaird that the parties appear to agree was made on

26 July 2007 at unidentified "senate hearings." The transcript of the hearing reports Senator Kinnaird as saying:

> I appreciate the work that's been done on this, and I think it's very important.
>
> And I hope that we pass this. *It's true we're a growing state, but we don't need to be bringing in garbage from Philadelphia and New York and New Jersey.* That has nothing to do with our growth.
>
> And I'd like to say that while people sort of acknowledge that recycling is out there, there's recycling and recycling.
>
> I have two counties. One does, and I have dyslexia with numbers, but I believe one does 64% recycling.
>
> The other has set a goal of 2%.
>
> We can aggressively recycle.

(Emphasis added.)

Apart from Senator Kinnaird's remark, plaintiffs point to a meeting hosted by Senator Basnight and attended by several senators at which members of the Division of Waste Management "went through the recommendations that had been presented" by DENR regarding landfill regulation, such as size limitations. The head of the Division acknowledged that out-of-state waste was mentioned by unidentified individuals, but he did not remember any particular discussions regarding what steps could be taken with respect to out-of-state waste. We cannot, based on this evidence, specifically attribute a discriminatory purpose to any of the senators present.

In any event, defendants contend that the courts are not permitted "to impute the motives or opinions" of individual legislators to the entire General Assembly, citing *United States v. O'Brien*, 391 U.S. 367, 383-84, 20 L. Ed. 2d 672, 684, 88 S. Ct. 1673, 1682-83 (1968) (emphasis added), in which the United States Supreme Court held:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. *It is entirely a different matter when we are asked to*

**WASTE INDUS. USA, INC. v. STATE OF N.C.**

[220 N.C. App. 163 (2012)]

*void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it,* and the stakes are sufficiently high for us to eschew guesswork.

Plaintiffs argue that defendants' citation of *O'Brien* is "wholly improper" as the decision has essentially been overruled, citing *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1528 (11th Cir. 1993), and *Hernandez v. Woodard,* 714 F. Supp. 963, 970 (N.D. Ill. 1989). Plaintiffs have, however, misread *Church of Scientology* and *Hernandez.* Those opinions questioned the viability of *O'Brien's* holding that the Court would not strike down an otherwise constitutional statute based on an alleged illicit motive -- a different issue from the reasoning above, which addressed how to prove Congressional purpose. *See Church of Scientology,* 2 F.3d at 1529; *Hernandez,* 714 F. Supp. at 970-71. In any event, subsequently, the United States Supreme Court reaffirmed the language questioned by the two lower federal courts. *See Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n,* 512 U.S. 622, 652, 129 L. Ed. 2d 497, 524, 114 S. Ct. 2445, 2464 (1994).

Under *O'Brien* and *Clover Leaf Creamery,* the speech of a single legislator (Senator Kinnaird) in an unidentified hearing and the presence of senators at a meeting at which out-of-state waste was mentioned by someone is not sufficient to void as unconstitutional N.C. Gen. Stat. § 130A-295.6.[1] *Village of Arlington Heights* does not require a different conclusion given its focus on legislative history, sworn testimony, minutes of meetings, and reports. 429 U.S. at 268, 50 L. Ed. 2d at 465-66, 97 S. Ct. at 564-65. Nothing in *Village of Arlington Heights* suggests that such speech is sufficient to establish—or even raise an issue of fact—regarding the constitutionality of a statute when the legislature has specifically set out constitutional purposes in the legislation. *Compare Chambers Med. Techs. of S.C., Inc. v. Bryant,* 52 F.3d 1252, 1259 (4th Cir. 1995) (emphasizing before considering remarks by legislators in hearings: "The South Carolina legislature did not include a statement of the purpose for the fluctu-

---

1. Because of the United States Supreme Court's holding in *O'Brien,* we need not decide whether our Supreme Court's opinion in *D & W, Inc. v. City of Charlotte,* 268 N.C. 577, 581-82, 151 S.E.2d 241, 244, *supplemented by* 268 N.C. 720, 152 S.E.2d 199 (1966) (holding that affidavit from legislator was "incompetent" to prove "legislative purpose" of General Assembly in enacting legislation), is controlling authority with respect to a claim under the federal constitution for violation of the Commerce Clause.

ating treatment cap in the legislation enacting it to which this court may defer in determining the purpose of the cap, nor are there committee reports reflecting the purpose of the cap.").

Next, plaintiffs point to the fact that DENR's proposed legislation did not include any buffer or height restrictions, and plaintiffs speculate, therefore, that DENR must not have believed such restrictions were necessary. Plaintiffs then make the additional leap of logic and argue that if DENR did not desire the challenged restrictions, then the General Assembly's articulated purposes for the restrictions must not have been the real reasons.

Plaintiffs have, however, cited to no evidence that DENR personnel in fact believed that the restrictions were unnecessary—defendant-intervenors, on the other hand, point to evidence in the record that DENR omitted the details of restrictions because the staff believed they should be left up to regulatory rule-making. Nor do plaintiffs cite any authority suggesting that an Executive Branch Department's proposed legislation—which does not even mention out-of-state waste—is relevant to determining the General Assembly's purpose in enacting different provisions and language after considering input from a wide range of sources regarding regulation of landfills received during the study period allowed by the Moratorium.[2]

The buffer, height, capacity, and size restrictions appear to have originally come from one of the intervenors, the North Carolina Coastal Federation ("NCCF"). The original NCCF recommendations included (1) a buffer from surface waters of 300 feet, prohibiting construction in wetlands or prior converted wetlands; (2) limiting total capacity to 25 million cubic feet; (3) limiting the area to 150 acres; and (4) limiting height to 200 feet. Lobbyists from the waste industry specifically requested that the limits be increased to 50 million cubic yards and a maximum height of 250 feet.

Ultimately, the Legislature implemented a limit of 55 million cubic yards, 5 million cubic yards in excess of what the industry lob-

2. Comments were received from the business community as well as State and Federal agencies, environmental groups, and environmental justice organizations, including DENR, the U.S. Fish and Wildlife Service, the N.C. Wildlife Resources Commission, the N.C. Department of Commerce, defendant-intervenor North Carolina Coastal Federation, Professor Steve Wing of the Department of Epidemiology of the School of Health at UNC-CH, Dr. Jennifer Norton, Blue Ridge Environmental Defense League, the North Carolina Environmental Justice Network, Conservation Council of North Carolina, Center for Competitive Waste Industry, National Solid Waste Management Association, North Carolina Association of County Commissioners, and defendant-intervenor the Sierra Club.

byists had requested; an area limit of 350 acres, well above the limit requested by NCCF; and a maximum height of 250 feet, as requested by industry lobbyists. N.C. Gen. Stat. § 130A-295.6(i). DENR's draft legislation must be considered in the context of all of the input received by the General Assembly as it was studying solid waste disposal during the Moratorium, including recommendations made by plaintiffs' own industry's lobbyists. In that context, DENR's unexplained omission of specific restrictions is not evidence of the General Assembly's having an unvoiced unconstitutional intent.

Plaintiffs further argue that the challenged legislation cannot have environmental concerns as its actual purpose because the Legislature "has made no effort to address" existing landfills or prohibit expansion of existing landfills that currently violate the buffer and size restrictions. However, as our Supreme Court has noted,

> "[t]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the Legislature must be held rigidly to the choice of regulating all or none. . . . It is enough that the present statute strikes at the evil where it is felt, and reaches the class of cases where it most frequently occurs."

*Adams v. N.C. Dep't of Natural & Econ. Res.*, 295 N.C. 683, 693, 249 S.E.2d 402, 408 (1978) (quoting *Silver v. Silver*, 280 U.S. 117, 123, 74 L. Ed. 2d 221, 226, 50 S. Ct. 57, 59 (1929)).

We turn back to the specific question before us: Does plaintiffs' evidence raise an issue of fact regarding whether the legislation at issue—specifically, the height, capacity, size, and buffer restrictions—was enacted under circumstances forcing the conclusion that the adoption of the restrictions was for the purpose of blocking out-of-state waste? We have found no case suggesting that the limited evidence presented by plaintiffs is sufficient to raise a question about whether the articulated purposes of the legislation were its actual objectives.

Plaintiffs cite only *Gilmore*, 252 F.3d at 336. However, the dramatic difference in the evidence in *Gilmore* from that in this case demonstrates the inadequacy of plaintiffs' evidence. The Fourth Circuit, in *Gilmore*, upheld the trial court's grant of summary judgment to the waste industry plaintiffs on their Commerce Clause claim on the ground "that no reasonable juror could find that in enacting the statutory provisions at issue Virginia's General Assembly acted without a discriminatory purpose." *Id.*

The Fourth Circuit based its decision on evidence of (1) the General Assembly's having just learned before enacting the legislation, that Virginia was the nation's second largest importer of waste; (2) press releases by the Governor and the state senator who introduced the legislation indicating that the purpose of the legislation was to restrict the amount of out-of-state waste entering Virginia; (3) memoranda from the introducing senator to other legislators providing background information regarding the issue of out-of-state waste imports; and (4) transcripts of speeches on the floor of the General Assembly establishing the legislature's hostility towards out-of-state waste. *Id.* at 336-340.

The Fourth Circuit concluded:

> The evidence just outlined shows unmistakably the legislative and gubernatorial opposition to further increases in the volume of [municipal solid waste] generated outside Virginia crossing the borders of Virginia for ultimate placement in Virginia's seven regional landfills. No reasonable juror could find the statutory provisions at issue had a purpose other than to reduce the flow of [municipal solid waste] generated outside Virginia into Virginia for disposal. Indeed, the very purpose the Defendants proffer in this litigation for the enactment of the statutory provisions at issue—to alleviate or at least reduce health and safety threats to Virginia's citizens and environment created by the importation of [municipal solid waste] from states with less strict limitations upon the content of [municipal solid waste] fully supports our conclusion. This is because an inherent component of the Defendants' proffered purpose of Virginia's enactment of the statutory provisions at issue is discrimination against [municipal solid waste] generated outside Virginia.

*Id.* at 340. Thus, in addition to official statements by the senator who authored the legislation, the Governor who signed it into law, and the legislators who enacted it, the State of Virginia essentially admitted, in the litigation, that the purpose of the legislation was to discriminate against out-of-state waste.

The evidence in this case stands in stark contrast, including the State's history of concern about the disposal of waste in landfills regardless of the source, the legislation's articulated objectives, no discriminatory statements by the sponsoring legislators, no discriminatory statements by the Governor himself, only a single remark by

one senator in an unspecified hearing rather than speeches by numerous legislators during the floor debate, and stray remarks made one to two years before the enactment of the challenged legislation by unidentified legislators in unknown contexts and non-legislators. We cannot say that the content of plaintiffs' evidence "forces us to conclude that [the objectives articulated] could not have been a goal of the legislation," *Clover Leaf Creamery*, 449 U.S. at 463 n.7, 66 L. Ed. 2d at 668 n.7, 101 S. Ct. at 723 n.7 (internal quotation marks omitted), especially in light of other circumstances identified by defendants and defendant-intervenors, including the extensive material provided to the General Assembly regarding legitimate concerns sought to be remedied.

We find the analysis of the Fifth Circuit persuasive:

> [T]he stray protectionist remarks of certain legislators are insufficient to condemn this statute. Our independent review of the legislative record reveals that the Legislature heard extensive testimony from various witnesses on the legitimate . . . concerns sought to be remedied . . . . This evidence provided a more than adequate and legitimate basis for the Legislature's decision to adopt the proposed regulations and undercuts [plaintiff's] contention that the enactment of the overall statutory scheme was driven by a discriminatory purpose.

*Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 161 (5th Cir. 2007). *See also Maine v. Taylor*, 477 U.S. 131, 148-50, 91 L. Ed. 2d 110, 127-28, 106 S. Ct. 2440, 2453 (1986) ("But there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a *post hoc* rationalization. In suggesting to the contrary, the Court of Appeals relied heavily on a 3-sentence passage near the end of a 2,000-word statement submitted in 1981 . . . . We fully agree with the Magistrate that [these] three sentences do not convert the Maine statute into an economic protectionism measure." (internal citation and quotation marks omitted)). In this case, we hold that plaintiffs have failed to forecast sufficient evidence that they will be able to meet the test set out in *Clover Leaf Creamery* and establish that the General Assembly actually had a purpose of discriminating against out-of-state waste.

B. Discriminatory Effect

Next, plaintiffs contend that the challenged legislation violates the Commerce Clause by having the effect of discriminating against

out-of-state waste. Plaintiffs have identified three possible discriminatory effects.

First, plaintiffs point to the fact that four proposed landfills, which intended to accept out-of-state waste, were not built. Plaintiffs' "effect" argument presumes that the purpose of the legislation was to eliminate these four planned landfill projects *because* they intended to accept out-of-state waste. However, since we have concluded that plaintiffs failed to present evidence giving rise to an issue of fact regarding the purpose of the legislation, plaintiffs cannot rely upon that supposed "purpose" to establish a discriminatory effect.

Regardless, even assuming that the legislation had the purpose and effect of blocking the four landfills, such an "effect" is not one that shows discrimination against out-of-state waste. Because the record contains no evidence that the proposed landfills would have accepted *only* out-of-state waste, the fact that the landfills were not built affected both in-state and out-of-state waste. Unlike in *Philadelphia v. New Jersey*, 437 U.S. 617, 57 L. Ed. 2d 475, 98 S. Ct. 2531 (1978) (holding unconstitutional statute prohibiting importing of out-of-state waste), the buffer, height, area, and capacity restrictions do not distinguish between in-state and out-of-state waste. Out-of-state waste can continue to come into the State because existing landfills can expand or new landfills can be built in compliance with the challenged restrictions.

The second discriminatory effect argued by plaintiffs is the fact that the restrictions make it impossible to construct large regional landfills that accept out-of-state waste in North Carolina. The legislation, however, neither prevents large regional landfills nor precludes the acceptance of out-of-state waste.

When the bill was enacted, North Carolina already had existing regional landfills. Further, only two of the four proposed landfills that plaintiffs argue were the intended target of the legislation exceeded the size limitation, with the other two projects being much smaller. Indeed, the record indicates that only about 1% of the landfills currently operating in the United States are larger than the maximum size limits set out in the challenged legislation. Finally, the height restrictions were what waste industry lobbyists had suggested, and the capacity was five million cubic yards bigger than the industry had requested.

Thus, the effect of the legislation was not to preclude regional landfills, but rather to prevent only extraordinarily large landfills

regardless of where the waste came from. Regional landfills exist and can continue to be built subject to the restrictions, and nothing prohibits them from taking in only out-of-state waste.

Plaintiffs' third discriminatory effect is the "near impossibility," as they contend, of construction of a landfill along North Carolina's coast, thereby hindering use of the most cost-effective means of transporting waste from out of state: barging. The United States Supreme Court has held, however, that "[w]e cannot . . . accept [the] underlying notion that the Commerce Clause protects the particular structure or methods of operation in a . . . market." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127, 57 L. Ed. 2d 91, 101, 98 S. Ct. 2207, 2215 (1978). As the Fourth Circuit has explained, "[t]he Clause does not purport to . . . protect the participants in intrastate or interstate markets, *nor the participants' chosen way of doing business*." *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009) (emphasis added). The barging of waste—rather than transporting it by truck or rail—is the plaintiffs' chosen way of doing business and that particular way of doing business is not protected by the Commerce Clause.

The trial court, therefore, did not err in concluding that plaintiffs failed to present evidence of discriminatory effect sufficient to avoid summary judgment. Because of plaintiffs' failure to demonstrate that the legislation is discriminatory facially, in purpose, or in effect, strict scrutiny does not apply, and we need not address plaintiffs' arguments regarding whether demonstrable justifications exist for the restrictions and whether there are non-discriminatory alternatives.

C. Rational Basis Review

We next consider whether the legislation is unconstitutional based on its incidental effect on interstate commerce. As the United States Supreme Court has explained:

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L. Ed. 2d 174, 178, 90 S. Ct. 844, 847 (1970).

The United States Supreme Court applied *Pike* in *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346, 167 L. Ed. 2d 655, 669, 127 S. Ct. 1786, 1797 (2007). In *United Haulers*, a flow control ordinance required that "all solid waste generated within the Counties be delivered to the [Solid Waste Management] Authority's processing sites." *Id.* at 336, 167 L. Ed. 2d at 663, 127 S. Ct. at 1791. The fees charged by the Authority's processing sites were significantly more than the fees charged at alternative facilities, all of which were out of state. *Id.* at 336-37, 167 L. Ed. 2d at 663-64, 127 S. Ct. at 1791-92.

However, the requirement that solid waste be delivered to the Authority provided environmental benefits, health benefits, and revenue, *id.* at 334-35, 167 L. Ed. 2d at 662, 127 S. Ct. at 1790-91, because the Authority's higher fees allowed it to provide extensive recycling, composting, household hazardous waste disposal, and other services, in addition to standard landfill transportation and solid waste disposal. *Id.* at 336, 167 L. Ed. 2d at 663, 127 S. Ct. at 1791. The Supreme Court concluded that the public benefits outweighed any incidental burden on interstate commerce that existed. *Id.* at 346, 167 L. Ed. 2d at 670, 127 S. Ct. at 1797.

Notably, in *United Haulers*, the Court characterized the plaintiffs' argument that the laws did not pass the "more permissive *Pike* test" as an invitation "to rigorously scrutinize economic legislation passed under the auspices of the police power." *Id.* at 347, 167 L. Ed. 2d at 670, 127 S. Ct. at 1798. The Court observed that "[t]here was a time when this Court presumed to make such binding judgments for society, under the guise of interpreting the Due Process Clause. We should not seek to reclaim that ground for judicial supremacy under the banner of the dormant Commerce Clause." *Id.* (internal citation omitted).

In this case, the challenged legislation similarly provides environmental, public health, environmental justice, and financial security benefits. Although plaintiffs protest that the State presented no scientific basis for any of these benefits, plaintiffs have cited no authority holding that a legislature must have a scientific basis for benefits that are the purpose of legislation. Instead, what is required is that the legislation "effectuate a legitimate local public interest," *Pike*, 397 U.S. at 142, 25 L. Ed. 2d at 178, 90 S. Ct. at 847, which the legislation at issue in this case does.

Still, defendants and defendant-intervenors have pointed to expert evidence supporting the buffer and size restrictions, including a letter from the U.S. Fish and Wildlife Service, a comprehensive study of the financial and physical failures of mega-landfills, and expert testimony regarding environmental justice issues, air and water quality impacts, and the effect on sensitive areas of non-native species attracted by landfills. The General Assembly had an ample basis for concluding that the legislation promoted the local purposes set out in the legislation itself.

Plaintiffs also argue that any benefits are cancelled out by the fact that existing landfills violating the restrictions may continue to operate or even expand, while, in addition, other offensive projects might be constructed in the buffer zones. "Grandfathering" by the legislature of some landfills does not make the legislation's requirements for new landfills "arbitrary or irrational." *Clover Leaf Creamery*, 449 U.S. at 468, 66 L. Ed. 2d at 671, 101 S. Ct. at 726. Further, as the Supreme Court emphasized, "a legislature need not strike at all evils at the same time or in the same way," but instead "a legislature may implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Id.* at 466, 66 L. Ed. 2d at 670, 101 S. Ct. at 725 (internal quotation marks omitted).

Finally, plaintiffs claim the burdens on interstate commerce are driving up the cost of disposal in North Carolina. Whatever additional cost results from the implementation of the statute will impact the cost of waste disposal for North Carolina's citizens. Just like the United States Supreme Court in *United Haulers*, we do not believe that it is our place to weigh in on the uniquely legislative public policy debate over whether the increased costs of waste disposal outweigh the benefits to the environment, public health, and environmental justice.

The United States Supreme Court, applying *Pike*, ended its *Clover Leaf Creamery* analysis by emphasizing: "Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause." *Id.* at 474, 66 L. Ed. 2d at 675, 101 S. Ct. at 729. Here, plaintiffs have not forecast evidence meeting that burden, and, therefore, the challenged legislation does not violate the Commerce Clause. The trial court properly granted summary judgment to defendants and defendant-intervenors on plaintiffs' Commerce Clause claim.

II

**[2]** Plaintiffs next contend that the enacted legislation violates the Contract Clause of the federal constitution by substantially impairing plaintiffs' franchise agreement with the County. Whether a change in state law is an impairment of contract in violation of the Contract Clause "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186, 117 L. Ed. 2d 328, 337, 112 S. Ct. 1105, 1109 (1992).

There is no dispute in this case that a contract exists. As for the second element, the United States Supreme Court stressed in *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190, 76 L. Ed. 2d 497, 509-10, 103 S. Ct. 2296, 2305 (1983) (internal citations and quotation marks omitted):

> Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people. This Court has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment. If the law were otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements.
>
> The Contract Clause does not deprive the States of their broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.

Here, the legislation at issue did not retroactively alter any rights of plaintiffs or Camden County under the franchise agreement or change either party's obligations. The franchise agreement did not grant plaintiffs a right to build or operate a landfill, but rather simply made it possible for plaintiffs to apply to the State for a permit allowing them to build and operate the landfill. *See* N.C. Gen. Stat. § 130A-294(b1)(2) ("A person who intends to apply for a new permit, the renewal of a permit, or a substantial amendment to a permit for a sanitary landfill shall obtain, *prior to applying for a permit*, a franchise for the operation of the sanitary landfill from each local government having jurisdiction over any part of the land on which the

sanitary landfill and its appurtenances are located or to be located." (emphasis added)).

The agreement did not guarantee plaintiffs would receive a permit or even be able to build their landfill. Indeed, the agreement anticipated that a permit might be denied or—as happened here—the law governing landfills might be changed. Either party could terminate the agreement if (1) "DENR fails or refuses to issue, grant or renew any permit," (2) "any change occurs in any applicable existing law, regulation, rule, ordinance or permit condition," or (3) "any new law, regulation, rule, ordinance or permit condition" adversely affected the project. Thus, the franchise agreement expressly contemplated what ultimately happened: the law changed.

Plaintiffs, however, argue that under *Faulkenbury v. Teachers' & State Emps.' Ret. Sys. of N.C.*, 345 N.C. 683, 483 S.E.2d 422 (1997), the legislation "cannot constitutionally be applied to prevent Plaintiffs' plans to build and operate the Proposed Landfill." In *Faulkenbury*, although the plaintiffs had vested retirement and disability benefits, state law changed reducing their disability retirement payments. *Id.* at 690, 483 S.E.2d at 426. The Supreme Court reasoned that "pursuant to the plaintiffs' contracts, they were promised that if they worked for five years, they would receive certain benefits if they became disabled. The plaintiffs fulfilled this condition. At that time, the plaintiffs' rights to benefits in case they were disabled became vested. The defendants could not then reduce the benefits." *Id.* at 692, 483 S.E.2d at 428.

No similar contract existed here. The very terms of the franchise agreement anticipated that change could occur and, in fact, that plaintiffs might never be able to build or operate their landfill. Plaintiffs had no rights under the franchise agreement that could be considered analogous to the vested rights in *Faulkenbury*. Because plaintiffs have not forecast any evidence that their contract with Camden County was unconstitutionally impaired, the trial court properly granted summary judgment to defendants and defendant-intervenors on the Contract Clause cause of action.

### III

[3] Lastly, plaintiffs contend that the trial court erred in granting defendants' motion for summary judgment because they had a common law vested right and, therefore, were entitled to have the law applied to their landfill project as it existed before the change in the statutes. As set forth by this Court in *Browning-Ferris Indus. of S.*

*Atl., Inc. v. Guilford Cnty. Bd. of Adjustment*, 126 N.C. App. 168, 171-72, 484 S.E.2d 411, 414 (1997) (internal citations and quotation marks omitted):

> The common law vested rights doctrine is rooted in the due process of law and the law of the land clauses of the federal and state constitutions and has evolved as a constitutional limitation on the state's exercise of its police power[s]. A party's common law right to develop and/or construct vests when: (1) the party has made, prior to the amendment of a zoning ordinance, expenditures or incurred contractual obligations substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building; (2) the obligations and/or expenditures are incurred in good faith; (3) *the obligations and/or expenditures were made in reasonable reliance on and after the issuance of a valid building permit, if such permit is required, authorizing the use requested by the party*; and (4) the amended ordinance is a detriment to the party. The burden is on the landowner to prove each of the above four elements.

(Emphasis added.)

For landfill projects, state law required a permit. Because no permit was issued in this case, plaintiffs cannot meet the requirement for the vested rights analysis that their expenditures on the proposed landfill "were made *in reasonable reliance on and after* the issuance of a valid . . . permit." *Id.* at 171, 484 S.E.2d at 414 (emphasis added). As a result, plaintiffs had no common law vested rights in the proposed landfill.

Plaintiffs assert that *Mission Hosps., Inc. v. N.C. Dep't of Health & Human Servs.*, 205 N.C. App. 35, 696 S.E.2d 163 (2010), entitled them "to have the law as it existed prior to the change." In *Mission Hospital*, the appellant received letters from the State confirming certain equipment and leases did not require Certificates of Need (CON). *Id.* at 37-38, 696 S.E.2d at 167. After purchase agreements were issued for the equipment, *id.* at 38, 696 S.E.2d at 170, the CON law was amended. *Id.*, 696 S.E.2d at 168. The amended statutes required a CON for the equipment. *Id.*, 696 S.E.2d at 169-70. This Court held that since the valid, binding purchase agreements occurred *at a time when no CON was required*, appellant had a vested right in the equipment. *Id.* at 46, 696 S.E.2d at 171-72.

Here, of course, a permit was in fact required at the time plaintiffs entered into the franchise agreement. As a result, *Browning-Ferris* controls, and plaintiffs have failed to show any violation of their common law vested rights. *See Griffin v. Town of Unionville, N.C.*, 338 F. App'x 320, 324-25 (4th Cir. 2009) (unpublished) (holding that even though plaintiff had entered into franchise agreement with local government, it had no vested right to build industrial solid waste facility when State denied permit because "[w]here multiple permits or governmental approvals are required for a project, a landowner has no vested right to complete that project unless he makes his substantial expenditures in good faith reliance on and after receiving all requisite permits or other required approvals").

In an argument related to their vested rights claim, plaintiffs next contend that the Legislature "misuse[d] the political process in order to dictate the outcome of an application to use one's property in a particular way." Plaintiffs cite *Robins v. Town of Hillsborough*, 361 N.C. 193, 639 S.E.2d 421 (2007) for the proposition that this Court has found such activity unconstitutional.

In *Robins*, the plaintiff filed a development plan with the Town of Hillsborough's Board of Adjustment to build an asphalt plant. *Id.* at 194-95, 639 S.E.2d at 423. The Court explained: "Instead of following the proper procedures by which the Board of Adjustment would have rendered an up or down decision on plaintiff's application, defendant [Town], acting through its Board of Commissioners, passed the moratorium [on asphalt plants] and eventually amended the ordinance [banning all asphalt plants], effectively usurping the Board of Adjustment's responsibility in the matter." *Id.* at 199, 639 S.E.2d at 425.

The Court reasoned that "[i]n essentially dictating by legislative fiat the outcome of a matter which should be resolved through quasi-judicial proceedings, defendant did not follow its own ordinance pertaining to the disposition of site specific development plans, thus leaving the Town Board no defense to the charge that its actions were arbitrary and capricious." *Id.* The Court then held that "when the applicable rules and ordinances are not followed by a town board, the applicant is entitled to have his application reviewed under the ordinances and procedural rules in effect as of the time he filed his application." *Id.*

Any resemblance between *Robins* and this case is at best superficial. Plaintiffs do not contend that the General Assembly failed to follow the applicable rules when passing the challenged legislation.

Moreover, the relationship between the Hillsborough Board of Commissioners and the Board of Adjustment is not analogous to the relationship between the General Assembly and DENR in this case.

Plaintiffs' assertions that only an executive agency—DENR—had the ability to regulate solid waste disposal and that the General Assembly "effectively usurped NCDENR's responsibility" disregards the basic civics principle that the legislature enacts the laws, while the executive branch carries out those laws. *See State v. Harris*, 216 N.C. 746, 754, 6 S.E.2d 854, 860 (1940) ("In licensing those who desire to engage in professions or occupations such as may be proper subjects of such regulation, the Legislature may confer upon executive officers or bodies the power of granting or refusing to license persons to enter such trades or professions only when it has prescribed a sufficient standard for their guidance. Where such a power is left to the unlimited discretion of a board, to be exercised without the guide of legislative standards, the statute is not only discriminatory but must be regarded as an attempted delegation of the legislative function offensive both to the State and the Federal Constitution." (internal citation omitted)).

It is well established that "[n]o one has the right for the General Assembly not to change a law." *State ex rel. Banking Comm'n v. Citicorp Sav. Indus. Bank of N.C.*, 74 N.C. App. 474, 477, 328 S.E.2d 895, 897 (1985). Additionally, "no person has a vested right in a continuance of the common or statute law. It follows that, generally speaking, a right created solely by the statute may be taken away by its repeal or by new legislation." *Pinkham v. Mercer*, 227 N.C. 72, 78, 40 S.E.2d 690, 694 (1946).

Plaintiffs have not cited any further evidence which would demonstrate that the actions of the Legislature were a misuse of the political process. Plaintiffs could not reasonably rely on the franchise agreement, as a permit was necessary before beginning the project, and the General Assembly followed the applicable procedures in adopting the Moratorium and then amending the solid waste disposal statutes. Therefore, the trial court properly granted summary judgment for defendants and defendant-intervenors on this claim as well.

Affirmed.

Judges STROUD and THIGPEN concur.